**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| R.J., an individual,<br><br>        Plaintiff<br>v.<br><br>SALESFORCE.COM, INC.,<br>BACKPAGE.COM, LLC,<br>WYNDHAM HOTELS & RESORTS, INC.,<br>PREET HOSPITALITY, LLC, RED ROOF<br>INNS, INC. D/B/A RED ROOF INN, DIWALI<br>HOUSTON EAST LLC, G6 HOSPITALITY<br>PROPERTY, LLC D/B/A MOTEL 6,<br>CHANDNI HOSPITALITY INC.,<br>INTERCONTINENTAL HOTELS GROUP<br>RESOURCES, LLC, AND<br>RSS MSBAM2014C17-TX HAH, LLC<br><br>        Defendants. | CIVIL ACTION NO. _____ |

**PLAINTIFF'S ORIGINAL COMPLAINT**

### I.   INTRODUCTION

1.     Sex trafficking has hit epidemic proportions in our communities, and has had a devastating effect on the victims and a crushing financial effect on our world.

2.     Sex trafficking presents a public health crisis.

3.     Those facilitating sex trafficking should be held accountable.

4.     It should not be our tax dollars, charities, and churches that carry the burden of the catastrophic harms and losses to sex trafficking survivors.

5.     That responsibility should fall to businesses like Salesforce.com, Inc. ("Salesforce"), Backpage.com, LLC ("Backpage"), Wyndham Hotels & Resorts, Inc. ("Wyndham"), Preet Hospitality, LLC ("Preet"), Red Roof Inns, Inc. d/b/a Red Roof Inn ("Red

Roof Inn"), Diwali Houston East, LLC ("Diwali"), G6 Hospitality Property, LLC d/b/a Motel 6 ("G6"), Chandni Hospitality, Inc. ("Chandni"), InterContinental Hotels Group Resources, LLC ("InterContinental"), and RSS MSBAM2014C17-TX HAH, LLC ("RSS") that have facilitated and profited from sex trafficking.

6.     While these businesses have profited, untold multitudes of victims were repeatedly raped and abused.

7.     These victims have been left with lifelong physical, emotional, and mental injuries.

8.     R.J. is but one of those victims—or rather—survivors.

9.     No longer will businesses profit off of the exploitation and mistreatment of others.

**The Role of the Hotels**

10.     Sex trafficking and the sexual exploitation of trafficking victims is a rampant and well-known problem in the hotel industry.

11.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[1]

12.     It has long been recognized that exploiters and traffickers use hotel and motel rooms when setting up "dates" between victims of sex trafficking and those individuals purchasing sex.

13.     In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[2]

---

[1] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (last viewed November 25, 2019) citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." Id.
[2] Michele Sarkisian, Adopting the Code: Human Trafficking and the Hotel Industry, Cornell Hotel Report, October 2015, at https://scholarship.sha.cornell.edu/cgi/vi ewcontent.cgi?article=1222&context=chrpubs Oct. 2015 (last viewed November 25, 2019).

14. The United States Department of Homeland Security established the Blue Campaign to end sex trafficking.[3]

15. In a recent Blue Campaign bulletin, the Department of Homeland Security outlines that traffickers have long used the hotel industry as a hotbed for sex trafficking.

16. Some of the recommended policies and procedures recommended by the Blue Campaign include learning to identify warning signs and indicators of sex trafficking. Warning signs identified in the recent Blue Campaign bulletin include, but are not limited to:

a. patrons paying for a room with cash or a pre-paid credit card;

b. other guests lingering outside a hotel room for long periods of time;

c. non-guests coming and going from the premises;

d. minors paying for hotel rooms; and

e. traffickers using other victim's identities to book rooms.

17. These recommended policies and procedures are intended to reduce sex trafficking. Traffickers have long capitalized on the hotel industry's refusal to adopt companywide anti-trafficking policies, such as the ones proposed by the Department of Homeland Security's Blue Campaign, refusal to train staff on what to look for and how to respond, failure to establish a safe and secure reporting mechanism, and they have exploited the seclusion and privacy of hotel rooms.

**The Role of Tech Companies**

18. Formerly, the sale of sex occurred face to face. If a buyer wanted to purchase sex, they would have to leave their home or hotel, locate the victim and conduct the transaction in person. With the development of technology, that is no longer the case. Technology has transformed the commercial sex trade, and, in the process, has contributed to the explosion of

---

[3] https://www.dhs.gov/blue-campaign (last viewed December 20, 2019).

domestic sex trafficking and compelled prostitution.

19.     Backpage was the leading online marketplace for the sale of sex and sex trafficking prior to being seized by the FBI in April of 2018. "Shutting down the largest online U.S. marketplace for sex trafficking will dramatically reduce the profitability of forcing people into the commercial sex trade, at least in the short term," said Bradley Myles, chief executive of Polaris, an international anti-slavery group that runs the National Human Trafficking Hotline.[4]

20.     The National Association of Attorneys General described Backpage as a "hub" of "human trafficking, especially the trafficking of minors."[5]

21.     During 2013-2015, Backpage earned over 99% of its revenue from adult ads, a substantial percentage of which came directly from on-line prostitution and sex trafficking.[6]

22.     Salesforce, a technology company, is undisputedly one of the world's greatest technology innovators, creating powerful and effective tools that have revolutionized business function and growth.

23.     In public, and on various social media platforms, Salesforce has boasted about fighting human trafficking. In reality, however, Salesforce owned and controlled the CRM platform on which Backpage operated. Additionally, Salesforce supplied Backpage with the specialized tools, support, and technical expertise needed to operate and grow its on-line selling of sex and sex trafficking business including R.J. and others.

---

[4]   https://www.reuters.com/article/us-usa-backpage-justice/sex-ads-website-backpage-shut-down-by-u-s-authorities-idUSKCN1HD2QP

[5] See https://agportal-s3bucket.s3.amazonaws.com/uploadedfiles/Home/News/Press_Releases/ 2011/NAAG_Backpage_Signon_08-31-11_Final.pdf, and the press release at https://www.atg.wa.gov/news/news-releases/attorneys-general-backpagecom-prove-you-re-fighting-human-trafficking

[6]https://oag.ca.gov/system/files/attachments/press_releases/signed%20dec%20for%20arrest%20warrant%20pdf_Redacted.pdf (at *11).

4

24. Salesforce has operated beyond the law while fighting any and all efforts to hold them accountable for their wrongful conduct, even in the face of the extraordinary efforts required to address the public health crisis they helped create.

25. Technology companies can no longer divorce themselves from the technologies they create and platforms they control when they are being used in an unlawful, harmful, and costly manner.

26. Technology companies should no longer escape liability for assisting, developing, and facilitating the growth of the unlawful selling of sex.

**JURISDICTION & VENUE**

27. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the Trafficking Victims Protection Reauthorization Act ("TRVPA"), 18 U.S.C. § 1581, *et seq.*

28. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this District and Division.

29. R.J. was trafficked in this District and Division.

30. Salesforce has sufficient contacts with Texas such that it is subject to personal jurisdiction in Texas.

31. Backpage has sufficient contacts with Texas such that it is subject to personal jurisdiction in Texas.

32. Wyndham Hotels & Resorts, Inc. has sufficient contacts with Texas such that it would be subject to personal jurisdiction in Texas, including but not limited to, operating a physical location location in Texas at 11002 Northwest Freeway Houston, Texas 77092

33.    Preet has sufficient contacts with Texas such that it would be subject to personal jurisdiction in Texas, including but not limited to, operating a physical location in Texas at 11002 Northwest Freeway Houston, Texas 77092.

34.    Red Roof Inns, Inc. d/b/a Red Roof Inn has sufficient contacts with Texas such that it would be subject to personal jurisdiction in Texas, including but not limited to, operating a physical location in Texas at 11999 East Fwy, Houston, Tx 77029.

35.    Diwali has sufficient contacts with Texas such that it would be subject to personal jurisdiction in Texas, including but not limited to, operating a physical location in Texas at 11999 East Fwy, Houston, Tx 77029.

36.    G6 Hospitality Property, LLC d/b/a Motel 6 has sufficient contacts with Texas such that it would be subject to personal jurisdiction in Texas, including but not limited to, operating a physical location in Texas.

37.    Chandni has sufficient contacts with Texas such that it would be subject to personal jurisdiction in Texas, including but not limited to, operating a physical location in Texas.

38.    InterContinental Hotels Group Resources, LLC has sufficient contacts with Texas such that it would be subject to personal jurisdiction in Texas, including but not limited to, operating a physical location in Texas at 15222 John F. Kennedy Blvd. Houston, TX  77032.

39.    RSS has sufficient contacts with Texas such that it would be subject to personal jurisdiction in Texas, including but not limited to, operating a physical location in Texas at 15222 John F. Kennedy Blvd. Houston, TX  77032.

### THE PARTIES

40.    R.J. is a natural person who is a resident and citizen of Tennessee.

6

41. Salesforce is a foreign corporation organized under the laws of Delaware with its principal place of business in California. Salesforce may be served by delivering a summons to its registered agent, C.T. Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas, 75201, or by any other method authorized by law.

42. Salesforce does business in a systematic and continuous manner throughout this District and Division.

43. All references to Salesforce includes any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of Salesforce now or at any time relevant to the claims herein.

44. Defendant Backpage.com, LLC ("Backpage") is a Delaware Limited Liability Corporation registered to do business and doing business in Texas. Backpage may be served through its attorney of record, Mark Castillo, 901 Main Street, Suite 6515, Dallas, Texas 75202.

45. All references to Backpage includes any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of Salesforce now or at any time relevant to the claims herein.

46. Wyndham Hotels & Resorts, Inc. is a Delaware corporation with its headquarters and principal place of business in New Jersey. Wyndham Hotels & Resorts, Inc. is authorized to, registered to, and does conduct business in Texas through its ownership, management, and operation of hotels throughout the State of Texas. Wyndham Hotels & Resorts, Inc. does not

maintain a registered agent in Texas. This lawsuit arises from Wyndham Hotels & Resorts, Inc.'s business in Texas; therefore, the Texas Secretary of State is the statutory agent for service under Tex. Civ. P. & Rem. Code 17.044. Accordingly, service on the Texas Secretary of State is requested to then forward to Wyndham Hotels & Resorts, Inc.'s registered agent for service: Corporate Creations Network, Inc., 3411 Silverside Road Tatnall Building - Suite No. 104, Wilmington, Delaware 19810.

47.    Preet Hospitality, LLC is a domestic corporation registered to do business in Texas. Preet may be served by delivering a summons to its registered agent, Chandrakant N. Patel at 11002 Northwest Freeway Houston, Texas 77092, or by any other method authorized by law.

48.    Red Roof Inns, Inc. d/b/a Red Roof Inn is a for-profit Delaware Corporation with its principal place of business in New Albany, Ohio. At all relevant times, Red Roof Inns, Inc. maintained its principal place of business in Texas, was authorized to do business in Texas, and derived substantial revenue from the Texas Marketplace. Red Roof Inns, Inc. may be served with process by serving its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

49.    Diwali Houston East, LLC is a domestic corporation registered to do business in Texas. Diwali may be served by delivering a summons to its registered agent, Anant Patel at 4103 Belt Line Rd. Addison, Texas 75001-4355, or by any other method authorized by law.

50.    G6 Hospitality Property, LLC d/b/a Motel 6 is a for-profit Delaware Company with its principal place of business in Carrolton, Texas. At all relevant times, G6 Hospitality Property, LLC maintained its nerve center in Texas, was authorized to do business in Texas, and derived substantial revenue from the Texas Marketplace. G6 Hospitality, LLC may be served with process

8

by serving its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

51. Chandni Hospitality, Inc. is a foreign corporation organized under the laws of Georgia with its principal place of business in Georgia. Chandni may be served by delivering a summons to its registered agent, Jaymen Chavda, at 8800 Roswell Road, Building C, Suite 230, Atlanta, GA, 30350, USA, or by any other method authorized by law.

52. InterContinental Hotels Group Resources, LLC is a for-profit Delaware company with its principal place of business in Atlanta, Georgia. InterContinental Hotels Group Resources, LLC is duly authorized to conduct business in Texas, conducts substantial business in Texas, and maintains a registered agent and principal office in Texas. InterContinental Hotels Group Resources, LLC may be served with process by serving its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

53. RSS MSBAM2014C17-TX HAH, LLC is a domestic corporation registered to do business in Texas. RSS may be served by delivering a summons to its registered agent, C.T. Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas, 75201, or by any other method authorized by law.

## BACKGROUND FACTS

**A. Sex trafficking hits epidemic proportions in the United States as a direct result of the internet.**

54. The internet has transformed the commercial sex trade, and in the process, the evil of sex trafficking has hit epidemic proportions.

55. Estimates are that in 2016 there were as many as 40.3 million victims of human trafficking and sexual exploitation worldwide, including 4.8 million people trapped in sexual

exploitation.[7]

56.     With the help of online advertising, pimps and traffickers can reach entirely new audiences, evade law enforcement detection and maintain control of victims by transporting them quickly between locations thus maximizing profits far beyond traditional trafficking methods.

57.     Sex trafficking previously took place on the streets, casinos, truck stops and in other physical locations. Now, most sex trafficking, including the trafficking of R.J., is facilitated online.

58.     Backpage, as early as 2008, had been publicly identified by law enforcement, United States Attorneys General and every United States Governor as the biggest and most notorious sex trafficking and pimping website in the United States.

59.     The National Association of Attorneys General described Backpage as a "hub" of "human trafficking, especially the trafficking of minors."[8]

60.     During 2013-2015, Backpage earned over 99% of its revenue from online sex trafficking.[9]

**B.      Salesforce acknowledges the responsibility, importance and the power technology companies have in our communities.**

61.     Salesforce's President of Legal and General Counsel, Amy Weaver, stated: "Businesses are becoming very powerful platforms for change. When you have power, it is imperative to use it in a positive way.[10]"

---

[7] INT'L LABOUR OFFICE, *Global estimates of modern slavery: Forced labour and forced marriage*, at 9, 38 (available at https://www.ilo.org/wcmsp5/groups/public/---dgreports/---dcomm/documents/publication/wcms_575479.pdf).)

[8] https://www.hsdl.org/?view&did=797979 (last accessed May 14, 2020).

[9] https://oag.ca.gov/system/files/attachments/press_releases/signed%20dec%20for%20arrest%20warrant%20pdf_Redacted.pdf (at *11).

[10] https://www.legal500.com/gc-magazine/interview/amy-weaver-general-counsel-salesforce/ (last accessed May 14, 2020).

10

62.   Salesforce does not deny that it has an ethical duty and obligation to prevent atrocities such as sex trafficking from being proliferated by its technology.

63.   Salesforce CEO and founder Marc Benioff stated[11]:

"Here at Salesforce, we have determined that this ethic(al) and humane use of technology, especially within the context of the Fourth Industrial Revolution, must be clearly addressed, not only by us, but by our entire industry. Our industry has reached an inflection point that must be supported by a strong set of guiding values.

We have to make sure that technology strengthens our societies, instead of weakening them. Technology needs to improve the human tradition, not undermine it."

64.   On October 16, 2019, Marc Benioff was vocal about the need to increase the regulation of tech by calling for complete reformation of the Communications Decency Act to hold technology companies accountable for when they fail our communities:[12]



---

[11] https://www.salesforce.com/company/ethical-and-humane-use/ (last accessed May 14, 2020).
[12] https://twitter.com/benioff/status/1184560764692107270?lang=en (last accessed May 14, 2020).

65.    Publicly, Salesforce took credit for using its talent and expertise to help fight human trafficking:





66.    Behind the scenes, however, Salesforce conducted business with one of the most prolific online sex trafficking sites ever known.

### C.    Salesforce chose to do business with Backpage.

67.    In 2013, Backpage did not have the ability to scale its online marketing and advertising platform into an international sex-trafficking hub without operational support, marketing innovation and guidance.

68.    In 2013, Backpage sought a partnership that would assist in growth objectives as well as concealing their activity and moving operations offshore to evade law enforcement.

69.     Salesforce advertises itself as a company that can drive business growth through the use of customer relationship management, marketing consultation and implementation, financial processing implementation and support, bespoke analytics and other applications and technology.

70.     Any reasonably prudent examination of Backpage's business operations or a simple google search would have indicated Backpage was not a general online marketplace but was actually the predominant force in online sex trafficking.

71.     At the time of Salesforce's involvement in 2013, Backpage's illegal activity was widely known and reported news.[13]

72.     In 2013, Backpage signed the first of many contracts with Salesforce and paid Salesforce for its technology and support.

73.     Even if Backpage's illegal business practices were not previously known to Salesforce, Salesforce was in a position where it would learn, and in fact did learn, about the illegal business practices of Backpage once the venture was formed. [14]

74.     Armed with this knowledge, Salesforce chose to financially benefit by doing business with Backpage, the largest sex trafficker in modern history.

**D.     Salesforce provided tools and expertise necessary for Backpage's exponential growth.**

75.     Salesforce sold and supported targeted solutions essential for Backpage's operational needs.

---

[13] *See, e.g.*, *See, e.g.*, Nicholas Kristof, N.Y. TIMES, Jan. 25, 2012, *Opinion | How Pimps Use the Web to Sell Girls*, available at https://www.nytimes.com/2012/01/26/opinion/how-pimps-use-the-web-to-sell-girls.html; Daniel Fisher, FORBES, Jan. 26, 2012, *Backpage Takes Heat, But Prostitution Ads Are Everywhere*, available at https://www.forbes.com/sites/danielfisher/2012/01/26/backpages-takes-heat-for-prostitution-ads-that-are-everywhere); https://www.justice.gov/opa/press-release/file/1052531/download (acknowledging that vast majority of activity was illegal).

[14] *See, e.g.,* https://www.bloomberg.com/news/videos/2019-03-27/salesforce-accused-of-aiding-sex-traffickers-video (noting that Backpage's illegal activities were well known as far back as 2008).

76.    Salesforce was the driving force that enabled Backpage to scale its operations. Salesforce provided the infrastructure for Backpage to move and operate its business overseas.

77.    When Backpage was under intense law enforcement scrutiny in 2015, Salesforce sold a duplicate copy of Backpage's system to a Backpage related entity in Amsterdam.

78.    Backpage relied on Salesforce's expertise to implement and execute the use of Salesforce's complicated technology. Salesforce's technology was used by Backpage to actively obtain and monitor data and additional information related to pimps and sex traffickers that were using Backpage. The use of this technology for these efforts was not a secret.

79.    Backpage was successful in getting additional services, ongoing support, and addressing evolving financial concerns through its ongoing communications and relationship with Salesforce.

80.    Salesforce provided SMS texting capabilities and support to Backpage, which was a technology not previously available to Backpage.

81.    Salesforce also provided Backpage with capabilities and support for direct marketing campaigns, coupled with information gathering such as ad clicks and tracking internet activity of the sex traffickers to help [Backpage] manage and track the effectiveness of [Backpage's] marketing efforts.

82.    Salesforce's technology then was a primary monitoring mechanism of the progress of Backpage's efforts in order to track its success, gain other information from the recipients and further automate and develop Backpage's operations.

83.    Every interaction that Salesforce's technology tracked through the CRM tools was an integral part of the strategy and technology used by Backpage to solicit sex traffickers and their victims.

84.     Salesforce designed and facilitated Backpage's CRM interface that allowed Backpage to integrate with credit card processors.

85.     Backpage used the CRM tools provided by Salesforce to interface with credit card processors giving Backpage the ability to accept payments from pimps and traffickers.

86.     Salesforce's relationship with Backpage endured several nationwide law enforcement efforts, multiple civil lawsuits against Backpage, the U.S. Senate hearing and most troubling, the arrest of Backpage's CEO for conspiracy to commit pimping by Attorney General Kamala Harris.

87.     From the time of its inception and until its conclusion (Salesforce's relationship with Backpage ended upon the seizure of Backpage by the Department of Justice), Salesforce succeeded in growing Backpage from a small Dallas based company with a handful of employees to an international powerhouse with over 250 employees spanning three continents.

88.     Based on publicly available documents, Backpage earned appropriately $71 million in revenue in 2012.   In the next 29 months, from January 2013 through May 2015, Backpage earned approximately $346 million in revenue, with nearly $340 million being from online sex trafficking.

**E.     R.J. is trafficked on Backpage during its relationship with Salesforce.**

89.     Tragically, before Backpage was seized by the Department of Justice, R.J. was trafficked by advertisements on Backpage.

90.     In or around 2014, R.J. was sold for unlawful sex acts through force, fraud and coercion.

91.     R.J. was trafficked through Backpage advertisements placed on Backpage's website under the "Houston" geographic area.

15

92.    R.J.'s trafficking in Houston as a result of Backpage advertisements occurred in 2014.

93.    The trafficking of R.J. was made possible by advertisements for sexual services on Backpage, facilitated by the tools and operational support provided by Salesforce.

94.    R.J. suffered significant physical and emotional injuries as a result of the trafficking.

**F.    R.J. was trafficked at G6 Hospitality's Motel 6 location in Atlanta, Georgia.**

95.    In 2013, R.J. was trafficked at a Motel 6, located at 311 Courtland St. NE, Atlanta, Georgia 30303, franchised by Defendant G6 and operated by Defendant Chandni.

96.    R.J's trafficker used the Motel 6, located at 311 Courtland St. NE, Atlanta, Georgia 30303 because he knew that members of the staff looked the other way.

**G.    R.J. was trafficked at Wyndham's Days Inn location in Houston, Texas.**

97.    Between 2015 and 2016, R.J. was trafficked at a Days Inn, located at 11002 Northwest Freeway Houston, Texas 77092, franchised by Defendant Wyndham Hotels & Resorts, Inc., and operated by Defendant Preet.

98.    R.J's trafficker used the Days Inn, located at 11002 Northwest Freeway Houston, Texas 77092 because he knew that members of the staff looked the other way.

**H.    R.J. was trafficked at a Red Roof Inn location in Houston, Texas.**

99.    In 2015, R.J. was trafficked at a Red Roof Inn, located at 11999 East Fwy, Houston, Texas 77029, franchised by Defendant Red Roof Inns, Inc. d/b/a Red Roof Inn, and operated by Defendant Diwali.

100.    R.J's trafficker used the Red Roof Inn, located at 11999 East Fwy, Houston, Texas 77029 because he knew that members of the staff looked the other way.

**I.      R.J. was trafficked at InterContinental's Holiday Inn location in Houston, Texas.**

101.    In 2013, R.J. was trafficked at a Holiday Inn, located at 15222 John F. Kennedy Blvd. Houston, TX  77032, franchised by Defendant InterContinental Hotels Group Resources, LLC, and operated by Defendant RSS.

102.    R.J's trafficker used the Holiday Inn, located at 15222 John F. Kennedy Blvd. Houston, TX  77032 because he knew that members of the staff looked the other way.

CAUSES OF ACTION

A.      CAUSES OF ACTION AGAINST SALESFORCE

1.      FIRST CAUSE OF ACTION—SEX TRAFFICKING PURSUANT TO TVPRA

103.    R.J. incorporates all other allegations as if set forth in full herein.

104.    At all relevant times, R.J. was and is a victim within the meaning of 18 U.S.C. § 1595(a).

105.    Salesforce knowingly benefitted from the products and assistance it provided to Backpage, which Salesforce knew or should have known was facilitating sex trafficking.

106.    More specifically, Salesforce knowingly assisted, supported and facilitated sex trafficking by, at a minimum, enabling Backpage to conduct the following:

   a. Gathering and managing information from traffickers' and pimps' public social media activity, including but not limited to their likes and dislikes and what they are saying and sharing about Backpage and its competitors;

   b. Developing an infrastructure for a trafficker and pimp database, as well as tracking and collecting trafficker and john data across multiple platforms including phone, email, websites and social media;

   c. Collecting traffickers' and pimps' data across multiple sources and channels and using this information to promote Backpage and the use of its services;

   d. Automatically generating insights into traffickers' and pimps' purchasing habits to help Backpage understand the traffickers better and predicting how they will feel and act so Backpage could prepare the most effective outreach;

17

e.　Collecting information of sex traffickers and victims to target through direct e-mail campaigns to advertise and promote illegal prostitution;

f.　Analyzing information and behavior of pimps and victims to target through direct e-mail campaigns to advertise and promote illegal prostitution;

g.　Utilization of cloud storage to store (and secure) operational database and information;

h.　Implementing a significant payment processing interface capability allowing Backpage to connect with credit card companies and integrating payment information with information about pimps and traffickers;

i.　Improving the solicitation of sales opportunities to traffickers and pimps for Backpage;

j.　Improving and implementing the solicitation of referrals from existing traffickers and pimps using Backpage by creating cross-selling and upselling opportunities;

k.　Duplication of operating system to evade law enforcement in or around 2015; and

l.　System modification to enable operation from three continents.

## 2.　SECOND CAUSE OF ACTION—VIOLATION OF TEXAS CIVIL PRACTICE & REMEDIES CODE §98

107.　R.J. incorporates all other allegations as if set forth in full herein.

108.　Salesforce's acts, omissions and commissions, taken separately and/or together, outlined above constitute a violation of Texas Civil Practice and Remedies Code § 98.002.

109.　Salesforce knowingly assisted, supported, and facilitated sex trafficking by, at a minimum, engaging in the acts described above in paragraph 108, which are incorporated by reference.

110.　Therefore, Salesforce is in violation of Texas Civil Practice and Remedies Code § 98.002.

## 3.　THIRD CAUSE OF ACTION—NEGLIGENCE

111.　R.J. incorporates all other allegations as if set forth in full herein.

18

112. Salesforce had a duty to the general public and to persons affected by its products, including R.J., to take reasonable steps to protect them from the foreseeable dangers of its products as related to human trafficking.

113. Salesforce failed to exercise ordinary care as would a reasonably prudent person under the same circumstances.

114. Salesforce was negligent by, at a minimum, providing the tools, expertise, and support to Backpage to facilitate and profit from the posting of sex trafficking victim, as more fully described in paragraph 108, which is incorporated by reference.

115. Furthermore, once Salesforce undertook a duty to provide its tools, expertise, and support to Backpage, it had an ongoing duty to ensure that those tools were being used for good, especially as Backpage's notoriety grew. Salesforce's negligence continued throughout its relationship with Backpage, as Salesforce continued to provide support for Backpage's sex trafficking operations.

116. Salesforce's negligent actions proximately caused legal injuries to R.J.

117. Each of Salesforce's negligent acts and omissions, singularly or collectively, constituted negligence and proximately caused legal injuries to R.J.

### 4. FOURTH CAUSE OF ACTION—GROSS NEGLIGENCE, RECKLESSNESS, WILLFUL AND WANTON CONDUCT

118. R.J. incorporates all other allegations as if set forth in full herein.

119. Salesforce's acts and omissions constitute gross neglect, recklessness and willful and wanton conduct.

120. Viewed objectively from the standpoint of Salesforce at the time of the incidents, Salesforce's acts and omissions involved an extreme degree of risk, considering the probability and magnitude of the potential harm to R.J. and other victims.

121. Salesforce nevertheless demonstrated an utter indifference to or conscious disregard for a person's safety or the safety of others, including R.J. Exemplary damages are warranted for Salesforce's gross negligence, recklessness and willful and wanton conduct.

## B.    CAUSES OF ACTION AGAINST BACKPAGE

### 1.    FIRST CAUSE OF ACTION—SEX TRAFFICKING PURSUANT TO TVPRA

122. R.J. incorporates all other allegations as if set forth in full herein.

123. At all relevant times, R.J. was and is a victim within the meaning of 18 U.S.C. U.S.C. § 1595(a).

124. Backpage directly facilitated sex trafficking through the posting of advertisements for sex trafficking, in addition the following non-exclusive acts:

   a. Providing a forum for R.J.'s trafficker to post her for trafficking;

   b. Failing to stop online posting of R.J. and other human or sex trafficking victims;

   c. Accepting advertising fees from www.backpage.com from human traffickers, including R.J.'s trafficker, despite actual and/or constructive knowledge that those advertisements were for illegal activities, such as, but not limited to human trafficking, prostitution, and/or sexual exploitation of victims;

   d. Designing and implementing The Strip Term from Ad Filter to automatically sanitize advertisements intended to promote human trafficking, prostitution, and/or the sexual exploitation of victims in an effort to maximize advertising revenue, customer satisfaction and avoid law enforcement detection of illegal acts;

   e. Designing and implementing, in order to maximize revenue, a manual moderation system intended to sanitize posted content advertising human trafficking, prostitution, and/or the sexual exploitation of victims to give those ads the appearance of promoting legal escort services as opposed to illegal services;

   f. Implementing a corporate policy to maximize revenue of sanitizing advertisements promoting human trafficking, prostitution, and/or sexual exploitation of victims instead of removing those advertisements from Backpage or reporting those advertisements to the proper law enforcement officers;

20

g. Knowingly implementing a corporate policy in order to maximize profit from the adult section of Backpage.com that discouraged moderators and employees of Backpage from contacting the authorities and/or advocacy groups when advertisements on Backpage.com clearly promoted human trafficking, prostitution, and/or sexual exploitation of victims;

h. Knowingly refusing to pull down advertisements (after Backpage had internally sanitized the ad either manually or with the use of the Strip Term from Ad Filter) that clearly demonstrated victims were being exploited and trafficked for sex; and

i. Knowingly refusing to pull down advertisements after reports and/or complaints that the advertisement was being used to exploit a victim.

125. Backpage directly benefited from the posting of advertisements for sex trafficking.

126. Backpage's TVPRA violations were a direct, producing and proximate cause of the injuries and damages to R.J.

### 2. SECOND CAUSE OF ACTION— TEXAS CIVIL PRACTICES AND REMEDIES CODE CHAPTER 98

127. R.J. incorporates all other allegations as if set forth in full herein.

128. Backpage's acts, omissions and commissions, taken separately and/or together, outlined above constitute a violation of Texas Civil Practice and Remedies Code § 98.002.

129. Backpage had a duty not to knowingly benefit, directly or indirectly, from a pattern of criminal activity, including but not limited to the trafficking of persons, such as R.J.

130. At all relevant times, Backpage breached this duty by knowingly participating in the facilitation of trafficking victims, including R.J., by acts and omissions including, but not limited to the acts described above in paragraph 126, which is incorporated by reference.

131. As described throughout this petition and above, Backpage received substantial financial benefits as a result of these acts and/or omissions. These acts, omissions and/or commissions were the producing, but for, and proximate cause of R.J.'s injuries and damages. Therefore, Backpage is in violation of Texas Civil Practice and Remedies Code § 98.002.

### 3. THIRD CAUSE OF ACTION—NEGLIGENCE

132. R.J. incorporates all other allegations as if set forth in full herein.

133. Backpage had a duty to the general public and to persons affected by its online sex trafficking business, including R.J., to take reasonable steps to protect them from the foreseeable dangers of sex trafficking.

134. Furthermore, Backpage undertook additional duties by deciding to monitor, edit, strip and otherwise moderate content. Once it undertook to perform these duties, it had an ongoing obligation to not breach such duties.

135. Backpage failed to exercise ordinary care as would a reasonably prudent person under the same circumstances.

136. Backpage was negligent, at a minimum, through the acts described above in paragraph 113, which are incorporated by reference.

137. Backpage's negligent actions were a proximate cause if R.J.'s injuries.

### 4. FOURTH CAUSE OF ACTION—GROSS NEGLIGENCE, RECKLESSNESS, WILLFUL AND WANTON CONDUCT

138. R.J. incorporates all other allegations as if set forth in full herein.

139. Backpage's acts and omissions constitute gross neglect, recklessness and willful and wanton conduct.

140. Viewed objectively from the standpoint of Backpage at the time of the incidents, Backpage's acts and omissions involved an extreme degree of risk, considering the probability and magnitude of the potential harm to R.J.

141. Backpage nevertheless demonstrated an utter indifference to or conscious disregard for a person's safety or the safety of others, including R.J.

22

142.   Exemplary damages are warranted for Backpage's gross negligence, recklessness and willful and wanton conduct.

**C.   CAUSES OF ACTION AGAINST BOTH BACKPAGE AND SALESFORCE**

CIVIL CONSPIRACY

143.   R.J. incorporate all other allegations.

144.   Salesforce entered into a civil conspiracy with Backpage. More specifically, Salesforce and Backpage are: 1) a combination of two or more persons; (2) Salesforce and Backpage sought to expand Backpage's operations; (3) Salesforce and Backpage reached a meeting of the minds on the course of action by entering into a contractual relationship; (4) at a minimum, using the tools, expertise and support of Salesforce, Backpage committed one or more unlawful, overt acts (i.e. the posting of illegal ads for sex trafficking); and (5) damages occurred as a proximate result of this conspiracy.

145.   Therefore, through the civil conspiracy between Backpage and Salesforce, each defendant is liable for the conduct of their co-conspirators.

**D.   CAUSES OF ACTION AGAINST WYNDHAM**

**1.   FIRST CAUSE OF ACTION—SEX TRAFFICKING PURSUANT TO TVPRA**

146.   R.J. incorporates all other allegations.

147.   At all relevant times, R.J. was and is a victim within the meaning of 18 U.S.C. § 1595(a).

148.   At all relevant times,  Wyndham was and is a perpetrator within the meaning of 18 U.S.C. § 1595(a).

149.    Wyndham benefitted, by receiving financial and other compensation, through its participation in a venture involving the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits. 18 U.S.C. §§ 1590(a), 1591(a)(2), 1593A.

150.    Wyndham knew or should have known it was participating in a venture involving the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits, in violation of the TVPRA, 18 U.S.C. § 1581, et seq.

151.    Wyndham participated in a venture with, among others, R.J.'s traffickers. Wyndham and R.J. comprise two or more persons.  Each of the venturers shared a common purpose – the rental of hotel rooms.  Wyndham profited while R.J.'s trafficker was able to purchase a secure venue to traffic R.J..  Wyndham took affirmative actions in furtherance of the venture by continually renting rooms to R.J.'s trafficker while ignoring the obvious signs of R.J.'s trafficking.

152.    Wyndham knowingly participated in the facilitation, harbouring, and/or maintenance of sex trafficking, including the sex trafficking of R.J., by acts and omissions, including but not limited to:

    a.    Profiting from renting rooms to those looking to sexually exploit R.J.;

    b.    Increasing profit margins due to lower operation costs by refusing to implement proper training;

    c.    Increasing profit margins due to lower operation costs by refusing to install proper security device;

    d.    Increasing profit margins due to lower operation costs by refusing to install adequate lighting and security cameras;

    e.    Increasing profit margins due to lower operation costs by refusing to hire qualified security officers;

    f.    Increasing profit margins as a result of continued customer loyalty by traffickers who sought to sexually exploit trafficking victims;

g.      Benefiting by avoiding law enforcement officials and/or spending the time to address, report, and properly solve sex trafficking and the sexual exploitation of trafficking victims on Wyndham's premises;

h.      Benefiting by avoiding criminal liability by corporations and/or employees who failed to report sexual exploitation—which is a violation of the Texas Penal Code;

i.      Encouraging and benefitting from continued customer loyalty by traffickers who sought to sexually exploit trafficking victims , including R.J., due to Wyndham's lack of measures against the sexual exploitation of trafficking victims and sex trafficking. This customer loyalty lead to continued sales;

j.      Increasing profit margins and benefitting by knowingly catering to the needs of a criminal sub-culture that is looking for locations that will not actively enforce laws against sex trafficking and the sexual exploitation of trafficking victims or take active security measures to prevent sex trafficking and the sexual exploitation of trafficking victims on their property.

153.    Wyndham received substantial financial benefits as a result of these acts and/or omissions.

154.    Wyndham received a direct financial benefit of the hotel rental fees paid by R.J.'s trafficker and johns, who sexually exploited R.J.

155.    Wyndham received financial benefits through the management of the Wyndham hotel at which R.J. was trafficked.

156.    Wyndham's TVPRA violations were a direct, producing, and proximate cause of the injuries and damages to R.J.

**2.      SECOND CAUSE OF ACTION— TEXAS CIVIL PRACTICES AND REMEDIES CODE CHAPTER 98**

157.    R.J. incorporates all other allegations as if set forth in full herein.

158.    Wyndham's acts, omissions and commissions, taken separately and/or together, outlined above constitute a violation of Texas Civil Practice and Remedies Code § 98.002.

25

159.   Wyndham had a duty not to knowingly benefit, directly or indirectly, from a pattern of criminal activity, including but not limited to the trafficking of persons, such as R.J.

160.   At all relevant times, Wyndham breached this duty by knowingly participating in the facilitation of trafficking victims, including R.J., by acts and omissions including, but not limited to the acts described above in paragraph 154, which is incorporated by reference.

161.   As described throughout this petition and above, Wyndham received substantial financial benefits as a result of these acts and/or omissions. These acts, omissions and/or commissions were the producing, but for, and proximate cause of R.J.'s injuries and damages. Therefore, Wyndham is in violation of Texas Civil Practice and Remedies Code § 98.002.

**E.   CAUSES OF ACTION AGAINST PREET**

**1.   FIRST CAUSE OF ACTION—SEX TRAFFICKING PURSUANT TO TVPRA**

162.   R.J. incorporates all other allegations.

163.   At all relevant times, R.J. was and is a victim within the meaning of 18 U.S.C. § 1595(a).

164.   At all relevant times, Preet was and is a perpetrator within the meaning of 18 U.S.C. § 1595(a).

165.   Preet benefitted, by receiving financial and other compensation, through its participation in a venture involving the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits. 18 U.S.C. §§ 1590(a), 1591(a)(2), 1593A.

166.   Preet knew or should have known it was participating in a venture involving the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits, in violation of the TVPRA, 18 U.S.C. § 1581, et seq.

26

167.    Preet participated in a venture with, among others, R.J.'s traffickers.  Preet and R.J. comprise two or more persons.  Each of the venturers shared a common purpose – the rental of hotel rooms.  Preet profited while R.J.'s trafficker was able to purchase a secure venue to traffic R.J..  Preet took affirmative actions in furtherance of the venture by continually renting rooms to R.J.'s trafficker while ignoring the obvious signs of R.J.'s trafficking.

168.    Preet knowingly participated in the facilitation, harbouring, and/or maintenance of sex trafficking, including the sex trafficking of R.J., by acts and omissions, including but not limited to:

a.    Profiting from renting rooms to those looking to sexually exploit R.J.;

b.    Increasing profit margins due to lower operation costs by refusing to implement proper training;

c.    Increasing profit margins due to lower operation costs by refusing to install proper security device;

d.    Increasing profit margins due to lower operation costs by refusing to install adequate lighting and security cameras;

e.    Increasing profit margins due to lower operation costs by refusing to hire qualified security officers;

f.    Increasing profit margins as a result of continued customer loyalty by traffickers who sought to sexually exploit trafficking victims;

g.    Benefiting by avoiding law enforcement officials and/or spending the time to address, report, and properly solve sex trafficking and the sexual exploitation of trafficking victims on Preet's premises;

h.    Benefiting by avoiding criminal liability by corporations and/or employees who failed to report sexual exploitation—which is a violation of the Texas Penal Code;

i.    Encouraging and benefitting from continued customer loyalty by traffickers who sought to sexually exploit trafficking victims , including R.J., due to Preet's lack of measures against the sexual exploitation of trafficking victims  and sex trafficking. This customer loyalty lead to continued sales;

j.    Increasing profit margins and benefitting by knowingly catering to the needs of a criminal sub-culture that is looking for locations that will not

actively enforce laws against sex trafficking and the sexual exploitation of trafficking victims or take active security measures to prevent sex trafficking and the sexual exploitation of trafficking victims on their property.

169. Preet received substantial financial benefits as a result of these acts and/or omissions.

170. Preet received a direct financial benefit of the hotel rental fees paid by R.J.'s trafficker and johns, who sexually exploited R.J.

171. Preet received financial benefits through the management of the Preet hotel at which R.J. was trafficked.

172. Preet's TVPRA violations were a direct, producing, and proximate cause of the injuries and damages to R.J.

## 2. SECOND CAUSE OF ACTION— TEXAS CIVIL PRACTICES AND REMEDIES CODE CHAPTER 98

173. R.J. incorporates all other allegations as if set forth in full herein.

174. Preet's acts, omissions and commissions, taken separately and/or together, outlined above constitute a violation of Texas Civil Practice and Remedies Code § 98.002.

175. Preet had a duty not to knowingly benefit, directly or indirectly, from a pattern of criminal activity, including but not limited to the trafficking of persons, such as R.J.

176. At all relevant times, Preet breached this duty by knowingly participating in the facilitation of trafficking victims, including R.J., by acts and omissions including, but not limited to the acts described above in paragraph 170, which is incorporated by reference.

177. As described throughout this petition and above, Preet received substantial financial benefits as a result of these acts and/or omissions. These acts, omissions and/or commissions were the producing, but for, and proximate cause of R.J.'s injuries and damages. Therefore, Preet is in violation of Texas Civil Practice and Remedies Code § 98.002.

**F.      CAUSES OF ACTION AGAINST RED ROOF INN**

**1.      FIRST CAUSE OF ACTION—SEX TRAFFICKING PURSUANT TO TVPRA**

178.   R.J. incorporates all other allegations.

179.   At all relevant times, R.J. was and is a victim within the meaning of 18 U.S.C. § 1595(a).

180.   At all relevant times, Red Roof Inn was and is a perpetrator within the meaning of 18 U.S.C. § 1595(a).

181.   Red Roof Inn benefitted, by receiving financial and other compensation, through its participation in a venture involving the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits. 18 U.S.C. §§ 1590(a), 1591(a)(2), 1593A.

182.   Red Roof Inn knew or should have known it was participating in a venture involving the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits, in violation of the TVPRA, 18 U.S.C. § 1581, et seq.

183.   Red Roof Inn participated in a venture with, among others, R.J.'s traffickers. Red Roof Inn and R.J. comprise two or more persons. Each of the venturers shared a common purpose – the rental of hotel rooms. Red Roof Inn profited while R.J.'s trafficker was able to purchase a secure venue to traffic R.J.. Red Roof Inn took affirmative actions in furtherance of the venture by continually renting rooms to R.J.'s trafficker while ignoring the obvious signs of R.J.'s trafficking.

184.   Red Roof Inn knowingly participated in the facilitation, harbouring, and/or maintenance of sex trafficking, including the sex trafficking of R.J., by acts and omissions, including but not limited to:

      a.      Profiting from renting rooms to those looking to sexually exploit R.J.;

29

b.   Increasing profit margins due to lower operation costs by refusing to implement proper training;

c.   Increasing profit margins due to lower operation costs by refusing to install proper security device;

d.   Increasing profit margins due to lower operation costs by refusing to install adequate lighting and security cameras;

e.   Increasing profit margins due to lower operation costs by refusing to hire qualified security officers;

f.   Increasing profit margins as a result of continued customer loyalty by traffickers who sought to sexually exploit trafficking victims;

g.   Benefiting by avoiding law enforcement officials and/or spending the time to address, report, and properly solve sex trafficking and the sexual exploitation of trafficking victims on Red Roof Inn's premises;

h.   Benefiting by avoiding criminal liability by corporations and/or employees who failed to report sexual exploitation—which is a violation of the Texas Penal Code;

i.   Encouraging and benefitting from continued customer loyalty by traffickers who sought to sexually exploit trafficking victims , including R.J., due to Red Roof Inn's lack of measures against the sexual exploitation of trafficking victims  and sex trafficking. This customer loyalty lead to continued sales;

j.   Increasing profit margins and benefitting by knowingly catering to the needs of a criminal sub-culture that is looking for locations that will not actively enforce laws against sex trafficking and the sexual exploitation of trafficking victims or take active security measures to prevent sex trafficking and the sexual exploitation of trafficking victims on their property.

185.   Red Roof Inn received substantial financial benefits as a result of these acts and/or omissions.

186.   Red Roof Inn received a direct financial benefit of the hotel rental fees paid by R.J.'s trafficker and johns, who sexually exploited R.J.

187.   Red Roof Inn received financial benefits through the management of the Red Roof Inn hotel at which R.J. was trafficked.

188. Red Roof Inn's TVPRA violations were a direct, producing, and proximate cause of the injuries and damages to R.J.

2. **SECOND CAUSE OF ACTION— TEXAS CIVIL PRACTICES AND REMEDIES CODE CHAPTER 98**

189. R.J. incorporates all other allegations as if set forth in full herein.

190. Red Roof Inn's acts, omissions and commissions, taken separately and/or together, outlined above constitute a violation of Texas Civil Practice and Remedies Code § 98.002.

191. Red Roof Inn had a duty not to knowingly benefit, directly or indirectly, from a pattern of criminal activity, including but not limited to the trafficking of persons, such as R.J.

192. At all relevant times, Red Roof Inn breached this duty by knowingly participating in the facilitation of trafficking victims, including R.J., by acts and omissions including, but not limited to the acts described above in paragraph 186, which is incorporated by reference.

193. As described throughout this petition and above, Red Roof Inn received substantial financial benefits as a result of these acts and/or omissions. These acts, omissions and/or commissions were the producing, but for, and proximate cause of R.J.'s injuries and damages. Therefore, Red Roof Inn is in violation of Texas Civil Practice and Remedies Code § 98.002.

**G. CAUSES OF ACTION AGAINST DIWALI**

1. **FIRST CAUSE OF ACTION—SEX TRAFFICKING PURSUANT TO TVPRA**

194. R.J. incorporates all other allegations.

195. At all relevant times, R.J. was and is a victim within the meaning of 18 U.S.C. § 1595(a).

196. At all relevant times, Diwali was and is a perpetrator within the meaning of 18 U.S.C. § 1595(a).

197.    Diwali benefitted, by receiving financial and other compensation, through its participation in a venture involving the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits. 18 U.S.C. §§ 1590(a), 1591(a)(2), 1593A.

198.    Diwali knew or should have known it was participating in a venture involving the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits, in violation of the TVPRA, 18 U.S.C. § 1581, et seq.

199.    Diwali participated in a venture with, among others, R.J.'s traffickers.  Diwali and R.J. comprise two or more persons.  Each of the venturers shared a common purpose – the rental of hotel rooms. Diwali profited while R.J.'s trafficker was able to purchase a secure venue to traffic R.J.  Diwali took affirmative actions in furtherance of the venture by continually renting rooms to R.J.'s trafficker while ignoring the obvious signs of R.J.'s trafficking.

200.    Diwali knowingly participated in the facilitation, harbouring, and/or maintenance of sex trafficking, including the sex trafficking of R.J., by acts and omissions, including but not limited to:

  a.    Profiting from renting rooms to those looking to sexually exploit R.J.;

  b.    Increasing profit margins due to lower operation costs by refusing to implement proper training;

  c.    Increasing profit margins due to lower operation costs by refusing to install proper security device;

  d.    Increasing profit margins due to lower operation costs by refusing to install adequate lighting and security cameras;

  e.    Increasing profit margins due to lower operation costs by refusing to hire qualified security officers;

  f.    Increasing profit margins as a result of continued customer loyalty by traffickers who sought to sexually exploit trafficking victims;

32

g.  Benefiting by avoiding law enforcement officials and/or spending the time to address, report, and properly solve sex trafficking and the sexual exploitation of trafficking victims on Diwali's premises;

h.  Benefiting by avoiding criminal liability by corporations and/or employees who failed to report sexual exploitation—which is a violation of the Texas Penal Code;

i.  Encouraging and benefitting from continued customer loyalty by traffickers who sought to sexually exploit trafficking victims , including R.J., due to Diwali's lack of measures against the sexual exploitation of trafficking victims  and sex trafficking. This customer loyalty lead to continued sales;

j.  Increasing profit margins and benefitting by knowingly catering to the needs of a criminal sub-culture that is looking for locations that will not actively enforce laws against sex trafficking and the sexual exploitation of trafficking victims or take active security measures to prevent sex trafficking and the sexual exploitation of trafficking victims on their property.

201.  Diwali received substantial financial benefits as a result of these acts and/or omissions.

202.  Diwali received a direct financial benefit of the hotel rental fees paid by R.J.'s trafficker and johns, who sexually exploited R.J.

203.  Diwali received financial benefits through the management of the Diwali hotel at which R.J. was trafficked.

204.  Diwali's TVPRA violations were a direct, producing, and proximate cause of the injuries and damages to R.J.

**2. SECOND CAUSE OF ACTION— TEXAS CIVIL PRACTICES AND REMEDIES CODE CHAPTER 98**

205.  R.J. incorporates all other allegations as if set forth in full herein.

206.  Diwali's acts, omissions and commissions, taken separately and/or together, outlined above constitute a violation of Texas Civil Practice and Remedies Code § 98.002.

207.    Diwali had a duty not to knowingly benefit, directly or indirectly, from a pattern of criminal activity, including but not limited to the trafficking of persons, such as R.J.

208.    At all relevant times, Diwali breached this duty by knowingly participating in the facilitation of trafficking victims, including R.J., by acts and omissions including, but not limited to the acts described above in paragraph 202, which is incorporated by reference.

209.    As described throughout this petition and above, Diwali received substantial financial benefits as a result of these acts and/or omissions. These acts, omissions and/or commissions were the producing, but for, and proximate cause of R.J.'s injuries and damages. Therefore, Diwali is in violation of Texas Civil Practice and Remedies Code § 98.002.

210.    **CAUSES OF ACTION AGAINST G6 HOSPITALITY**

1.      **FIRST CAUSE OF ACTION—SEX TRAFFICKING PURSUANT TO TVPRA**

211.    R.J. incorporates all other allegations.

212.    At all relevant times, R.J. was and is a victim within the meaning of 18 U.S.C. § 1595(a).

213.    At all relevant times,  G6 Hospitality was and is a perpetrator within the meaning of 18 U.S.C. § 1595(a).

214.    G6 Hospitality benefitted, by receiving financial and other compensation, through its participation in a venture involving the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits. 18 U.S.C. §§ 1590(a), 1591(a)(2), 1593A.

215.    G6 Hospitality knew or should have known it was participating in a venture involving the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits, in violation of the TVPRA, 18 U.S.C. § 1581, et seq.

34

216.    G6 Hospitality participated in a venture with, among others, R.J.'s traffickers. G6 Hospitality and R.J. comprise two or more persons. Each of the venturers shared a common purpose – the rental of hotel rooms. G6 Hospitality profited while R.J.'s trafficker was able to purchase a secure venue to traffic R.J. G6 Hospitality took affirmative actions in furtherance of the venture by continually renting rooms to R.J.'s trafficker while ignoring the obvious signs of R.J.'s trafficking.

217.    G6 Hospitality knowingly participated in the facilitation, harbouring, and/or maintenance of sex trafficking, including the sex trafficking of R.J., by acts and omissions, including but not limited to:

a.    Profiting from renting rooms to those looking to sexually exploit R.J.;

b.    Increasing profit margins due to lower operation costs by refusing to implement proper training;

c.    Increasing profit margins due to lower operation costs by refusing to install proper security device;

d.    Increasing profit margins due to lower operation costs by refusing to install adequate lighting and security cameras;

e.    Increasing profit margins due to lower operation costs by refusing to hire qualified security officers;

f.    Increasing profit margins as a result of continued customer loyalty by traffickers who sought to sexually exploit trafficking victims;

g.    Benefiting by avoiding law enforcement officials and/or spending the time to address, report, and properly solve sex trafficking and the sexual exploitation of trafficking victims on G6 Hospitality's premises;

h.    Benefiting by avoiding criminal liability by corporations and/or employees who failed to report sexual exploitation—which is a violation of the Texas Penal Code;

i.    Encouraging and benefitting from continued customer loyalty by traffickers who sought to sexually exploit trafficking victims , including R.J., due to G6 Hospitality's lack of measures against the sexual exploitation of trafficking victims  and sex trafficking. This customer loyalty lead to continued sales;

j.      Increasing profit margins and benefitting by knowingly catering to the needs of a criminal sub-culture that is looking for locations that will not actively enforce laws against sex trafficking and the sexual exploitation of trafficking victims or take active security measures to prevent sex trafficking and the sexual exploitation of trafficking victims on their property.

218.   G6 Hospitality received substantial financial benefits as a result of these acts and/or omissions.

219.   G6 Hospitality received a direct financial benefit of the hotel rental fees paid by R.J.'s trafficker and johns, who sexually exploited R.J.

220.   G6 Hospitality received financial benefits through the management of the G6 Hospitality hotel at which R.J. was trafficked.

221.   G6 Hospitality's TVPRA violations were a direct, producing, and proximate cause of the injuries and damages to R.J.

**2.     SECOND CAUSE OF ACTION— TEXAS CIVIL PRACTICES AND REMEDIES CODE CHAPTER 98**

222.   R.J. incorporates all other allegations as if set forth in full herein.

223.   G6 Hospitality's acts, omissions and commissions, taken separately and/or together, outlined above constitute a violation of Texas Civil Practice and Remedies Code § 98.002.

224.   G6 Hospitality had a duty not to knowingly benefit, directly or indirectly, from a pattern of criminal activity, including but not limited to the trafficking of persons, such as R.J.

225.   At all relevant times, G6 Hospitality breached this duty by knowingly participating in the facilitation of trafficking victims, including R.J., by acts and omissions including, but not limited to the acts described above in paragraph 218, which is incorporated by reference.

226.   As described throughout this petition and above, G6 Hospitality received substantial financial benefits as a result of these acts and/or omissions. These acts, omissions and/or

commissions were the producing, but for, and proximate cause of R.J.'s injuries and damages.

Therefore, G6 Hospitality is in violation of Texas Civil Practice and Remedies Code § 98.002.

## H.    CAUSES OF ACTION AGAINST CHANDNI

### 1.    FIRST CAUSE OF ACTION—SEX TRAFFICKING PURSUANT TO TVPRA

227.    R.J. incorporates all other allegations.

228.    At all relevant times, R.J. was and is a victim within the meaning of 18 U.S.C. § 1595(a).

229.    At all relevant times, Chandni was and is a perpetrator within the meaning of 18 U.S.C. § 1595(a).

230.    Chandni benefitted, by receiving financial and other compensation, through its participation in a venture involving the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits. 18 U.S.C. §§ 1590(a), 1591(a)(2), 1593A.

231.    Chandni knew or should have known it was participating in a venture involving the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits, in violation of the TVPRA, 18 U.S.C. § 1581, et seq.

232.    Chandni participated in a venture with, among others, R.J.'s traffickers. Chandni and R.J. comprise two or more persons. Each of the venturers shared a common purpose – the rental of hotel rooms. Chandni profited while R.J.'s trafficker was able to purchase a secure venue to traffic R.J.. Chandni took affirmative actions in furtherance of the venture by continually renting rooms to R.J.'s trafficker while ignoring the obvious signs of R.J.'s trafficking.

233.    Chandni knowingly participated in the facilitation, harbouring, and/or maintenance of sex trafficking, including the sex trafficking of R.J., by acts and omissions, including but not limited to:

a.    Profiting from renting rooms to those looking to sexually exploit R.J.;

b.    Increasing profit margins due to lower operation costs by refusing to implement proper training;

c.    Increasing profit margins due to lower operation costs by refusing to install proper security device;

d.    Increasing profit margins due to lower operation costs by refusing to install adequate lighting and security cameras;

e.    Increasing profit margins due to lower operation costs by refusing to hire qualified security officers;

f.    Increasing profit margins as a result of continued customer loyalty by traffickers who sought to sexually exploit trafficking victims;

g.    Benefiting by avoiding law enforcement officials and/or spending the time to address, report, and properly solve sex trafficking and the sexual exploitation of trafficking victims on Chandni's premises;

h.    Benefiting by avoiding criminal liability by corporations and/or employees who failed to report sexual exploitation—which is a violation of the Texas Penal Code;

i.    Encouraging and benefitting from continued customer loyalty by traffickers who sought to sexually exploit trafficking victims , including R.J., due to Chandni's lack of measures against the sexual exploitation of trafficking victims  and sex trafficking. This customer loyalty lead to continued sales;

j.    Increasing profit margins and benefitting by knowingly catering to the needs of a criminal sub-culture that is looking for locations that will not actively enforce laws against sex trafficking and the sexual exploitation of trafficking victims or take active security measures to prevent sex trafficking and the sexual exploitation of trafficking victims on their property.

234.    Chandni received substantial financial benefits as a result of these acts and/or omissions.

235.    Chandni received a direct financial benefit of the hotel rental fees paid by R.J.'s trafficker and johns, who sexually exploited R.J.

236.    Chandni received financial benefits through the management of the Chandni hotel at which R.J. was trafficked.

237.   Chandni's TVPRA violations were a direct, producing, and proximate cause of the injuries and damages to R.J.

### 2.   SECOND CAUSE OF ACTION— TEXAS CIVIL PRACTICES AND REMEDIES CODE CHAPTER 98

238.   R.J. incorporates all other allegations as if set forth in full herein.

239.   Chandni's acts, omissions and commissions, taken separately and/or together, outlined above constitute a violation of Texas Civil Practice and Remedies Code § 98.002.

240.   Chandni had a duty not to knowingly benefit, directly or indirectly, from a pattern of criminal activity, including but not limited to the trafficking of persons, such as R.J.

241.   At all relevant times, Chandni breached this duty by knowingly participating in the facilitation of trafficking victims, including R.J., by acts and omissions including, but not limited to the acts described above in paragraph 234, which is incorporated by reference.
As described throughout this petition and above, Chandni received substantial financial benefits as a result of these acts and/or omissions. These acts, omissions and/or commissions were the producing, but for, and proximate cause of R.J.'s injuries and damages. Therefore, Chandni is in violation of Texas Civil Practice and Remedies Code § 98.002.

## I.   CAUSES OF ACTION AGAINST INTERCONTINENTAL

### 1.   FIRST CAUSE OF ACTION—SEX TRAFFICKING PURSUANT TO TVPRA

242.   R.J. incorporates all other allegations.

243.   At all relevant times, R.J. was and is a victim within the meaning of 18 U.S.C. § 1595(a).

244.   At all relevant times,  InterContinental was and is a perpetrator within the meaning of 18 U.S.C. § 1595(a).

245.   InterContinental benefitted, by receiving financial and other compensation, through its participation in a venture involving the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits. 18 U.S.C. §§ 1590(a), 1591(a)(2), 1593A.

246.   InterContinental knew or should have known it was participating in a venture involving the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits, in violation of the TVPRA, 18 U.S.C. § 1581, et seq.

247.   InterContinental participated in a venture with, among others, R.J.'s traffickers. InterContinental and R.J. comprise two or more persons.  Each of the venturers shared a common purpose – the rental of hotel rooms.  InterContinental profited while R.J.'s trafficker was able to purchase a secure venue to traffic R.J..  InterContinental took affirmative actions in furtherance of the venture by continually renting rooms to R.J.'s trafficker while ignoring the obvious signs of R.J.'s trafficking.

248.   InterContinental knowingly participated in the facilitation, harbouring, and/or maintenance of sex trafficking, including the sex trafficking of R.J., by acts and omissions, including but not limited to:

    a.   Profiting from renting rooms to those looking to sexually exploit R.J.;

    b.   Increasing profit margins due to lower operation costs by refusing to implement proper training;

    c.   Increasing profit margins due to lower operation costs by refusing to install proper security device;

    d.   Increasing profit margins due to lower operation costs by refusing to install adequate lighting and security cameras;

    e.   Increasing profit margins due to lower operation costs by refusing to hire qualified security officers;

    f.   Increasing profit margins as a result of continued customer loyalty by traffickers who sought to sexually exploit trafficking victims;

g.   Benefiting by avoiding law enforcement officials and/or spending the time to address, report, and properly solve sex trafficking and the sexual exploitation of trafficking victims on InterContinental's premises;

h.   Benefiting by avoiding criminal liability by corporations and/or employees who failed to report sexual exploitation—which is a violation of the Texas Penal Code;

i.   Encouraging and benefitting from continued customer loyalty by traffickers who sought to sexually exploit trafficking victims , including R.J., due to InterContinental's lack of measures against the sexual exploitation of trafficking victims  and sex trafficking. This customer loyalty lead to continued sales;

j.   Increasing profit margins and benefitting by knowingly catering to the needs of a criminal sub-culture that is looking for locations that will not actively enforce laws against sex trafficking and the sexual exploitation of trafficking victims or take active security measures to prevent sex trafficking and the sexual exploitation of trafficking victims on their property.

249.   InterContinental received substantial financial benefits as a result of these acts and/or omissions.

250.   InterContinental received a direct financial benefit of the hotel rental fees paid by R.J.'s trafficker and johns, who sexually exploited R.J.

251.   InterContinental received financial benefits through the management of the InterContinental hotel at which R.J. was trafficked.

252.   InterContinental's TVPRA violations were a direct, producing, and proximate cause of the injuries and damages to R.J.

**2. SECOND CAUSE OF ACTION— TEXAS CIVIL PRACTICES AND REMEDIES CODE CHAPTER 98**

253.   R.J. incorporates all other allegations as if set forth in full herein.

254.   InterContinental's acts, omissions and commissions, taken separately and/or together, outlined above constitute a violation of Texas Civil Practice and Remedies Code § 98.002.

255. InterContinental had a duty not to knowingly benefit, directly or indirectly, from a pattern of criminal activity, including but not limited to the trafficking of persons, such as R.J.

256. At all relevant times, InterContinental breached this duty by knowingly participating in the facilitation of trafficking victims, including R.J., by acts and omissions including, but not limited to the acts described above in paragraph 249, which is incorporated by reference.

257. As described throughout this petition and above, InterContinental received substantial financial benefits as a result of these acts and/or omissions. These acts, omissions and/or commissions were the producing, but for, and proximate cause of R.J.'s injuries and damages. Therefore, InterContinental is in violation of Texas Civil Practice and Remedies Code § 98.002.

## J.   CAUSES OF ACTION AGAINST RSS

### 1.   FIRST CAUSE OF ACTION—SEX TRAFFICKING PURSUANT TO TVPRA

258. R.J. incorporates all other allegations.

259. At all relevant times, R.J. was and is a victim within the meaning of 18 U.S.C. § 1595(a).

260. At all relevant times, RSS was and is a perpetrator within the meaning of 18 U.S.C. § 1595(a).

261. RSS benefitted, by receiving financial and other compensation, through its participation in a venture involving the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits. 18 U.S.C. §§ 1590(a), 1591(a)(2), 1593A.

262.    RSS knew or should have known it was participating in a venture involving the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits, in violation of the TVPRA, 18 U.S.C. § 1581, et seq.

263.    RSS participated in a venture with, among others, R.J.'s traffickers.  RSS and R.J. comprise two or more persons.  Each of the venturers shared a common purpose – the rental of hotel rooms.  RSS profited while R.J.'s trafficker was able to purchase a secure venue to traffic R.J..  RSS took affirmative actions in furtherance of the venture by continually renting rooms to R.J.'s trafficker while ignoring the obvious signs of R.J.'s trafficking.

264.    RSS knowingly participated in the facilitation, harbouring, and/or maintenance of sex trafficking, including the sex trafficking of R.J., by acts and omissions, including but not limited to:

a.    Profiting from renting rooms to those looking to sexually exploit R.J.;

b.    Increasing profit margins due to lower operation costs by refusing to implement proper training;

c.    Increasing profit margins due to lower operation costs by refusing to install proper security device;

d.    Increasing profit margins due to lower operation costs by refusing to install adequate lighting and security cameras;

e.    Increasing profit margins due to lower operation costs by refusing to hire qualified security officers;

f.    Increasing profit margins as a result of continued customer loyalty by traffickers who sought to sexually exploit trafficking victims;

g.    Benefiting by avoiding law enforcement officials and/or spending the time to address, report, and properly solve sex trafficking and the sexual exploitation of trafficking victims on InterContinental's premises;

h.    Benefiting by avoiding criminal liability by corporations and/or employees who failed to report sexual exploitation—which is a violation of the Texas Penal Code;

i.  Encouraging and benefitting from continued customer loyalty by traffickers who sought to sexually exploit trafficking victims , including R.J., due to InterContinental's lack of measures against the sexual exploitation of trafficking victims  and sex trafficking. This customer loyalty lead to continued sales;

j.  Increasing profit margins and benefitting by knowingly catering to the needs of a criminal sub-culture that is looking for locations that will not actively enforce laws against sex trafficking and the sexual exploitation of trafficking victims or take active security measures to prevent sex trafficking and the sexual exploitation of trafficking victims on their property.

265.   RSS received substantial financial benefits as a result of these acts and/or omissions.

266.   RSS received a direct financial benefit of the hotel rental fees paid by R.J.'s trafficker and johns, who sexually exploited R.J.

267.   RSS received financial benefits through the management of the RSS hotel at which R.J. was trafficked.

268.   InterContinental's TVPRA violations were a direct, producing, and proximate cause of the injuries and damages to R.J.

2. **SECOND CAUSE OF ACTION— TEXAS CIVIL PRACTICES AND REMEDIES CODE CHAPTER 98**

269.   R.J. incorporates all other allegations as if set forth in full herein.

270.   RSS's acts, omissions and commissions, taken separately and/or together, outlined above constitute a violation of Texas Civil Practice and Remedies Code § 98.002.

271.   RSS had a duty not to knowingly benefit, directly or indirectly, from a pattern of criminal activity, including but not limited to the trafficking of persons, such as R.J.

272.   At all relevant times, RSS breached this duty by knowingly participating in the facilitation of trafficking victims, including R.J., by acts and omissions including, but not limited to the acts described above in paragraph 265, which is incorporated by reference.

44

273. As described throughout this petition and above, RSS received substantial financial benefits as a result of these acts and/or omissions. These acts, omissions and/or commissions were the producing, but for, and proximate cause of R.J.'s injuries and damages. Therefore, RSS is in violation of Texas Civil Practice and Remedies Code § 98.002.

## DISCOVERY RULE

274. R.J. adopts and incorporates by reference the allegations contained in the preceding paragraphs, the same as if set forth fully hereafter in this section.

275. The discovery rule is applicable to all of R.J.'s causes of action in this matter. More specifically, given the nature of R.J.'s trafficking and severe trauma she endured, the extent of her injuries (from which she is still suffering) were not discovered until a significant time after her trafficking ended.

## DAMAGES

276. The Defendants' acts and omissions, individually and collectively, caused R.J. to sustain legal damages.

277. R.J. is entitled to be compensated for personal injuries and economic damages, including:

   a.   Actual damages;

   b.   Direct damages;

   c.   Incidental and consequential damages;

   d.   Mental anguish and emotional distress damages (until trial and in the future);

   e.   Restitution;

   f.   Unjust enrichment; and

   g.   Penalties.

278. R.J. is entitled to exemplary damages by statute.

279.  R.J. is entitled to treble damages.

280.  R.J. is entitled to recover attorneys' fees and costs of court.

281.  R.J. is entitled to pre- and post-judgment interest at the maximum legal rates.

282.  A constructive trust should be imposed on Backpage and Salesforce and the Court should sequester any benefits or money wrongfully received by Backpage and Salesforce for the benefit of R.J.

## JURY TRIAL

283.  R.J. demands a jury trial on all issues.

## RELIEF SOUGHT

284.  Wherefore, R.J. respectfully requests judgment against the Defendants for actual damages in excess of the minimum jurisdictional limits of this Court, pre- and post-judgment interest as allowed by law, costs of suit, attorney fees and all other relief, at law or in equity, to which she may be justly entitled.

Respectfully submitted,

ANNIE MCADAMS PC

By: /s/ Annie McAdams
       ANNIE MCADAMS, PC
       Annie McAdams
       State Bar No. 24051014
       S.D. Tex. No. 1514589
       1150 Bissonnet
       Houston, Texas 77005
       Telephone: (713) 785-6262
       Facsimile: (866) 713-6141
       annie@mcadamspc.com

       and

SICO HOELSCHER HARRIS LLP
David E. Harris
State Bar No. 24049273
S.D. Tex. No. 712461
802 N. Carancahua, Ste. 900
Corpus Christi, Texas 78401
Telephone: (361) 653-3300
Facsimile: (361) 653-3333
dharris@shhlaw.com

and

THE GALLAGHER LAW FIRM
Michael T. Gallagher
State Bar No. 07586000
S.D. Tex. No. 5395
Pamela McLemore
State Bar No. 24099711
2905 Sackett Street
Houston, Texas 77098
Telephone: (713) 222-8080
Facsimile: (713) 222-0066
mike@gld-law.com
pamm@gld-law.com

**ATTORNEYS FOR PLAINTIFF**